# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

HARRIET PARKER,              )
                                        )
              Plaintiff,        )
                                          )      Case No. 12-cv-8275
                 v.                )
                                          )      Judge Joan B. Gottschall
ILLINOIS HUMAN RIGHTS      )
COMMISSION, et al.,           )
                                          )
             Defendants.     )

## MEMORANDUM OPINION & ORDER

Plaintiff Harriet Parker ("Parker") filed a thirteen-count First Amended Complaint ("FAC") against Defendants the Illinois Human Rights Commission ("IHRC" or "Commission") and IHRC Chairman Martin Castro ("Castro") in his personal capacity (collectively, "Defendants").  Defendants filed a motion to dismiss the FAC in its entirety, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).  This court granted Defendants' motion to dismiss in part and denied it in part.  Parker has three counts remaining against Defendants: (1) retaliation in violation of her First Amendment rights brought pursuant to § 1983 against Castro (Count I); (2) retaliation in violation of 42 U.S.C. § 1981 brought pursuant to § 1983 against Castro (Count IV); and (3) retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Act") against IHRC.  Before the court is Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) ("Motion").  For the reasons discussed in detail below, Defendants' Motion is granted in part and denied in part.

## I.       FACTS

The court takes the following facts from the parties' Local Rule 56.1 statements and exhibits.  The facts are undisputed unless expressly noted.

The IHRC is an agency of the state of Illinois. (Defs. 56.1 St. ¶ 3.) Parker, an African-American female, served as the General Counsel for the IHRC from December 2007 to May 20, 2011. (*Id*. ¶ 1.) Parker's position as General Counsel for the IHRC was a *Rutan*-Exempt position.[1] (*Id*. ¶ 6.) Although the parties disagree as to whether the position of General Counsel specifically, or a *Rutan*-exempt position generally, is a "political appointment," the parties agree that a *Rutan*-exempt position such as General Counsel of the IHRC serves at the pleasure of the Office of the Governor. (*Id*. ¶ 6.)

Castro was appointed by Governor Quinn as Chairman of the IHRC, a position he has held since December 2009. (Defs. 56.1 St., ¶ 2.) Keith Chambers ("Chambers") has held the position of Executive Director of the IHRC since 2007. (*Id.*, ¶ 9.) As the Executive Director, Chambers serves as the Chief Operating Officer for the day-to-day operations of management, direction, and leadership. (*Id.*). Chambers works directly with Chairman Castro and the Commissioners of the IHRC. (*Id.*). One of Chambers' responsibilities was to conduct Parker's performance evaluations. (*Id.*, ¶ 10).

As General Counsel, Parker performed the following duties: (1) advised and provided legal counsel for the Commissioners on cases pending before the IHRC for adjudication; (2) advised and consulted with the IHRC on issues which might affect policy, decisions, and actions of the IHRC; (3) drafted orders and briefs that were issued by the IHRC; (4) served as the Director of the Open Meetings Act; (5) conducted community outreach; (6) assisted with annual reports and audits; (7) drafted rules and regulations; (8) supervised legal and administrative staff; (9) assisted in the procurement of the staff for the IHRC; (10) trained Commissioners and staff; (11) monitored labor disputes; (12) responded to FOIA requests; (13) worked with the Chairman

---

[1] If a position is *Rutan*-exempt, the State may lawfully make decisions regarding the hiring, promotion, transfer, or recall from layoff for the position based on political affiliation or support because the position is either a confidential or policymaking position. *Rutan v. Republican Party of Ilinois*, 497 U.S. 62, 74 (1990).

of the IHRC on issues that were relevant to the IHRC; and (14) interacted with other State of Illinois agencies.  (Defs. 56.1 St. ¶ 11.)

Although the parties dispute whether Parker was *required* to perform all the above duties, it is undisputed that some of those duties are listed in the position description for General Counsel of the IHRC.  (Defs. 56.1 St. Ex. C at Compl. Ex. C-D)  For example, the duty to "[o]ffer advise [sic] and consultation to the Commission which may affect policy, decision, and actions of the agency" is listed in the position description.  (*Id.*)  In addition, the policy description states that the General Counsel advises on changes in administrative procedures, legislation, and Department recommendations which affect Commission activities.  (*Id.*)  The General Counsel also participates in drafting bills or amendments, or comments on the impact of proposed legislation.  (*Id.*)  Furthermore, Parker had a duty to assist in and cooperate with the Executive Director in creating, planning, developing, and implementing programs and procedures to lawfully carry out the statutory duties of the Commission.  (*Id.*)  Parker was also required to report any issues or situations that she believed would cause any type of "disgrace" to the State or generate adverse publicity.  (Defs. 56.1 St. ¶ 15.)  Finally, Parker served as the Chief Ethics Officer for the IHRC.  (*Id.* ¶ 14)  As Chief Ethics Officer, if Parker observed an IHRC employee or Commissioner doing something she believed was unethical, she was required to report it to the Office of the General Counsel for the Illinois Governor ("OGC").  (*Id.*)

The allegations in Parker's FAC arise from the events surrounding a case pending before the IHRC,  Rosetta Davis v. Elmbrook Healthcare & Rehabilitation Center, LLC (hereinafter the "Rosetta Davis case") in 2010.  Rosetta Davis ("Davis"), an African-American female and complainant, was a nurse's aide who alleged discrimination against Elmbrook Healthcare & Rehabilitation Center ("Elmbrook"), the respondent.  (*Id.*)  Commissioners Marti Baricevic

("Baricevic"), Robert Enriquez ("Enriquez"), and Gregory Simoncini ("Simoncini") (collectively, "Panel A") presided over the Rosetta Davis case while it was pending before the IHRC. (*Id.* ¶ 32) At the time of the Rosetta Davis case, Donyelle Gray ("Gray"), an African-American female, served as the Deputy General Counsel for the IHRC (*Id.*, ¶ 33). Gray is currently the General Counsel for the IHRC. (*Id.* ¶ 33).

On November 18, 2010, Panel A heard oral argument in the Rosetta Davis case. (Defs. 56.1 St. ¶ 37.) During oral argument, Parker testified, she observed Simoncini and Baricevic engage in behavior that she believed showed bias in favor of the complainant. Parker testified that she observed Simoncini repeatedly cut off counsel for respondent. (*Id.*, ¶ 38.) Parker heard Baricevic state that she agreed with complainant's counsel's statement that the ALJ (administrative law judge) "could not have done a good job on the Recommended Order and Decision ("ROD") because he completed it within a few months." (*Id.*, ¶ 38.)

Parker testified that she also observed Simoncini display inappropriate behavior toward Gray, who was present during the Rosetta Davis hearing. (Defs. 56.1 St. ¶ 35.) In general terms, Parker testified that Simoncini was "basically very rude and vicious" towards Gray throughout the entire hearing. (Defs. 56.1 St. Ex. A at 59:12-14.) Parker testified that Panel A's decision in the Rosetta Davis Case in favor of complainant was contrary to the Illinois Human Rights Act ("IHRA"). (*Id.*, ¶ 43.)

Following the November 18, 2010 oral argument in the Rosetta Davis case, on November 22, 2010, Parker sent Castro an email asking to speak with him regarding the conduct of one of the Commissioners on one of the Panels. (Pls. St. Add'l Facts ¶ 4.) Parker testified during her October 20, 2014 deposition that she was referring to Simoncini and Panel A in her email to Castro. (Pls. St. Add'l Facts Ex. C, 75:8 to 78:14.) During their meeting, Parker described to

Castro the facts of the Rosetta Davis case and explained the applicable rule of law and the standard of review. (*Id.*, ¶ 40.) Parker opined that Panel A had come to the wrong decision, that Panel A was inappropriately rude toward Gray, and that Simoncini showed bias in favor of the complainant. (Defs. 56.1 St. ¶ 40.)

Parker also complained about Simoncini's behavior to Jay Stewart ("Stewart"), Chief Legal Counsel for the OGC in the Governor's Office and to Velisha Haddox ("Haddox"), the IHRC liaison to the OGC. (Defs. 56.1 St. ¶ 40.) Parker voiced the same concerns to Stewart and Haddox that she had with Castro. (*Id.*, ¶¶ 41-42.) Parker told Stewart that Simoncini should be replaced because he was a negative presence on the Commission. (*Id.* ¶ 41.)

On November 23, 2010, less than one week after the oral argument in the Rosetta Davis Case, Parker submitted a monthly report to the OGC. (Defs. 56.1 St. ¶ 44.) In the report, Parker stated, in a section entitled "Public Issues," that "we are experiencing serious difficulties with one of the Commissioners." (*Id.*) Parker stated that this Commissioner refused to follow the IHRA and refused to follow her legal counsel regarding the standard of review. (*Id.*) Parker also expressed her belief that this Commissioner was "determined to do what he wanted and was not interested in following the IHRA." (*Id.*) Lastly, Parker said, "[T]his Commissioner's behavior is in dereliction of the Act, and therefore, is not in furtherance of the interest of justice and has the potential of bringing shame upon the entire Commission, and upon the State." (*Id.*) The following two months, on December 6, 2010 and January 4, 2011, Parker submitted additional monthly reports to the OGC which repeated these views. (*Id.* ¶ 45.)

Castro received a call from Jennifer Koehler ("Koehler"), Deputy General Counsel for the OGC, indicating that Parker had complained in writing that Commissioner Simoncini and other Commissioners were acting outside the law in the Rosetta Davis case. (Defs. 56.1 St. ¶

46.)  Castro told Parker that he did not want to interfere with her reporting responsibilities to the OGC, but to the extent there were any volatile issues, he would appreciate notice because he was surprised by the call from Koehler.  (*Id.*)

On February 7, 2011, Parker, Castro, and Simoncini met to discuss Panel A's decision in the Rosetta Davis case.  During the meeting, Parker and Simoncini accused each other of displaying bias toward certain parties with cases pending before the IHRC.  (Defs. 56.1 St. ¶ 51.) Parker met with Castro again about a week later, on February 15, 2011, to discuss another incident regarding Simoncini that took place during a panel meeting on January 26, 2011.  (*Id.*, ¶ 59.)  According to Parker, Simoncini became upset with Gray after she counseled Panel A that it could not review a private settlement agreement, and Simoncini shouted that "he was sick of being told what the Commission can and cannot do."  (*Id.*, ¶ 49.)  Parker did not witness the event, but it was described to her by Gray.  Parker advised Castro that Simoncini's behavior toward Gray was exposing the Commission to a racial discrimination complaint.  (*Id.*, ¶ 59.)

According to Castro, Parker asked him not to follow IHRC's investigative procedures concerning her allegations of Simoncini's racial bias against Gray. (Defs. 56.1 St. ¶ 60.) Instead, she suggested that Castro inform each Commissioner individually because Castro would not want something like this to get out to the public.  (*Id.*)  Castro did not take Parker's advice; he spoke with Chambers and asked Chambers to begin the formal investigation process.  (*Id.*) Chambers started the investigation by speaking with Gray and Simoncini.  (*Id.* ¶ 61.)  Gray told Chambers that Simoncini had been aggressive towards her as a result of differing opinions about procedural matters, and she felt she was not treated like her predecessors who were not African-American.  (*Id.* ¶ 62.)  According to Chambers, Simoncini opined that the personnel issues

stemmed from the General Counsel's lack of deference and tact in dealing with the Commissioners.  (*Id.* ¶ 63.)

One of Parker's other duties was to serve as the Open Meetings Act ("OMA") Officer for the IHRC, interpreting the OMA and ensuring that the IHRC was following it.  (Defs. 56.1 St. ¶ 17.)   The OMA required meetings of State agencies be open to the public and/or recorded.  (*Id.* ¶ 18.)   However, under certain circumstances ("exceptions"), an agency, including IHRC Commissioners, can go into "Executive Session," closing a meeting or a portion of a meeting to the public.  (*Id.*)

Castro told Parker that he wanted to go into Executive Session on February 23, 2011 to discuss the personnel issues between Simoncini and Parker and the allegations of bias both Parker and Simoncini accused each other of having in favor of certain parties with cases pending before the IHRC.  (Defs. 56.1 St. ¶ 54.)   Parker told Castro that the issues that Castro sought to address in Executive Session did not fall within the exceptions to the OMA.  (*Id.* ¶ 55.)  Castro later received information from the Governor's Office that the issues regarding Parker and Simoncini could be discussed in Executive Session.  (*Id.* ¶ 57.)

During his deposition, Castro testified that he believed Parker purposely provided erroneous legal advice regarding OMA exceptions to prevent him from bringing up Parker's conduct at the IHRC meeting.  (Defs. 56.1 St. Ex. B at 29:24-30:24.)  Castro also testified that he felt threatened by Parker when she indicated that she could file an ethics claim against Castro if he were to move forward with having her conduct considered at the IHRC meeting.  (*Id.* at 102:8-104:9.)  But neither Castro nor Chambers could suggest a personal benefit Parker could gain by intentionally misrepresenting that Castro could not go into Executive Session with the Commissioners.  (Pls. St. Add'l Facts ¶ 24.)

Ultimately an Executive Session was held on February 23, 2011, attended by Castro and the Commissioners. During the Execution Session, there was discussion of Parker's performance, as well as Parker's allegations of Simoncini's racial bias against Gray and the conduct of Panel A during arguments in the Rosetta Davis case. (Defs. 56.1 St. ¶ 64.) Castro informed the Commissioners that he had lost all confidence in Parker and had had concerns about her early in his term. He brought up issues with Parker's performance in connection with the issue of whether the IHRC could act as a certifying agency for "U-Visas" for commission witnesses, whether Parker had performed adequately in connection with the execution of an intergovernmental agreement regarding labor issues, and whether Parker had properly responded to Castro's complaints about problems with meeting minutes she took. (*Id.* ¶¶ 19, 24, 27.) None of the issues brought up by Castro were reflected in Parker's performance evaluations for September 2008 and September 2009. (*Id.* ¶ 25.)

A number of Commissioners voiced concerns regarding Parker's performance as General Counsel during the Executive Session. (*Id.*) Commissioner Simoncini stated that he felt that IHRC's Office of the General Counsel lacked respect for the Commissioners. (*Id.* ¶ 65.) Commissioner Sakhawat Hussain ("Hussain") stated that the General Counsel's role should be advisory and supportive, but Parker was being dictatorial. (*Id.* ¶ 69.) He stated that it was impossible to make crucial decisions without the support of the General Counsel. (*Id.*)

Commissioner Baricevic stated that she was concerned with the quality of the communication between the General Counsel and the Panels. (Defs. 56.1 St. ¶ 66.) Commissioner Munir Muhammad ("Muhammad") stated that Parker believed she ran the entire operation, acting as a dictator, not as an advisor. (*Id.* ¶ 70.) Commissioner Spencer Leak

("Leak") noted that he had previously complained to Parker that he was not happy with her job performance as General Counsel. (*Id.* ¶ 68.)

Parker was terminated on May 20, 2011. Defendants assert that Parker was terminated as a result of the IHRC Commissioners, IHRC Chairman, and Office of the Governor losing confidence in her. (Defs. 56.1 St. ¶ 74.) John Schomberg, former general Counsel to Governor Quinn, denied that the Office of the Governor had a role in deciding to terminate Parker. (Pl. St. Add'l Facts Ex. D at 10:1-22, 16:14-17:8.) Rather, Schomberg testified, the Governor's Office simply did not object to the IHRC's decision to terminate Parker. (Pl. St. Add'l Facts Ex. D at 10:1-22, 16:14-17:8.)

On November 29, 2011, Parker filed a Charge of Discrimination against the IHRC alleging discrimination based on race and sex and retaliation. (Defs. 56.1 St. ¶ 78.) On July 17, 2012, the EEOC issued Plaintiff a right to sue letter. (*Id.* ¶ 79.)

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court construes the facts in a light most favorable to the non-moving party and draws all reasonable inferences in

favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505. The existence of a factual dispute alone is not sufficient to defeat a summary judgment motion. Instead the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## II.     ANALYSIS

### A.     Title VII Retaliation Claim

"Title VII forbids retaliating against an employee 'because he has opposed any practice made ... unlawful ... by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *Collins v. American Red Cross*, 715 F.3d 994, 998 (7th Cir.2013) (quoting 42 U.S.C. § 2000e–3(a)).

A preliminary issue is whether Parker is the kind of "employee" entitled to sue under Title VII. The relevant section of the Act that defines the term "employee" reads:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. . . .

42 U.S.C. § 2000e(f).

The Act thus excludes from its coverage four types of employees: (1) elected officials; (2) the personal staff of an elected official; (3) appointees on the policymaking level; and (4) "an immediate advisor with respect to the exercise of the constitutional or legal powers of the office." *Opp v. Office of State's Attorney of Cook County*, 630 F.3d 616, 619 (7th Cir. 2010).

Defendants argue that Parker is excluded from coverage under the Act because she was an appointee on the policymaking level. Parker argues that General Counsel of the IHRC was not an appointed position and that she was not a policymaker.

An individual is considered an appointee on the policymaking level if "the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decisions where there is room for principled disagreement on goals or their implementation." *Americanos v. Carter*, 74 F.3d 138, 141 (7th Cir. 1996) (quoting *Heideman v. Wirsing*, 7 F.3d 659, 663 (7th Cir. 1993)). This test is derived from two cases in which the Supreme Court permitted employee dismissals of individuals holding policymaking positions based on political affiliation. *See generally Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). The Seventh Circuit has stated that "the test for determining if someone is an 'employee'… is essentially indistinguishable from that applied in the political firing context under the *Elrod/Branti* doctrine." *Opp*, 630 F.3d at 620, *quoting Americanos*, 74 F.3d at 144.

Parker argues that she was "hired" and not "appointed." The only evidence Parker presents to support her position that she was not "appointed" is testimony from Keith Chambers describing the process by which the position of the General Counsel was filled. However, Chambers also testified that the position of General Counsel is an appointed position. The parties agree that the position of General Counsel is a *Rutan*-exempt position.

If a position is *Rutan*-exempt, the State may lawfully make decisions regarding the hiring, promotion, transfer, or recall from layoff for the position based on political affiliation or support because the position is either a confidential or policymaking position. *Rutan*, 497 U.S. at 7. Because the test for determining if someone is an "employee" is essentially indistinguishable from that applied in the political firing context under *Elrod/Branti*, it follows that whether a

position is *Rutan*-exempt dictates whether a person is an "employee" under the Act. Therefore, Parker was not an "employee" within the purview of Title VII.

The position description of the General Counsel further supports the view that Parker was a policymaker. In determining whether someone is a policymaker, a court is to examine the powers inherent in a given office rather than the functions performed by a particular occupant of that office. *Tomczak v. City of Chicago*, 765 F.2d 633, 640-41 (7th Cir. 1985). As noted, Parker had a duty to offer advice and consultation to the Commission which could affect policy, decisions, and actions of the agency. Parker also had a duty to advise on changes in administrative procedures, legislation, and Department recommendations which could affect Commission activities. Parker had the responsibility of participating in drafting bills and amendments and commenting on the impact of proposed legislation. Finally, Parker had the responsibility to assist in and cooperate with the Executive Director in creating, planning, developing, and implementing programs and procedures to carry out the statutory duties of the Commission. The above-described duties and responsibilities are indicated in the position description for the Office of the General Counsel. Whether Parker actually performed any or all of these duties is immaterial. *Opp*, 630 F.3d at 621.

Parker was a policymaker and *Rutan*-exempt employee . She was not an employee within the meaning of Title VII. Summary judgment is granted in favor of Defendants as to Parker's Title VII claim for retaliation.

**B.     Section 1981 Retaliation Claim**

> **i.     *Prima Facie* Case**

Section 1981 encompasses claims for retaliation. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 445, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). In the context of laws governing

employment rights, "unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Smith v. Bray,* 681 F.3d 888, 896 (7th Cir. 2012). The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981. *See Humphries,* 474 F.3d at 403–04.

Plaintiff may establish retaliation in violation of Title VII using either the direct or indirect method of proof. *Harper v. C.R. England, Inc.* 687 F.3d 297, 306 (7th Cir. 2012). To survive summary judgment on a Title VII retaliation claim under the direct method of proof, Plaintiff must submit evidence from which a jury could reasonably conclude that (1) she engaged in statutorily protected activity; (2) she suffered a material adverse action; and (3) a causal link exists between the two. *See Porter v. City of Chi.*, 700 F.3d 944, 957 (7th Cir. 2012).

Under the indirect, burden-shifting approach, Plaintiff may establish a *prima facie* case of retaliation by showing that: (1) she was engaged in a statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered a materially adverse action; and (4) was treated less favorably than a similarly situated employee who did not engage in the statutorily protected activity. *Harper*, 687 F.3d at 309. Once Plaintiff has established a prima facie case, the burden shifts to Defendants to articulate a non-discriminatory reason for discharging Plaintiff. *Id.* If Defendants meet their burden, the burden then shifts back to Plaintiff to show that a genuine issue of material fact exists as to whether the Defendants' proffered reason was pretextual. *Id.* Although Parker argues that (1) she met the IHRC's expectations; and (2) the reasons proffered by the IHRC for firing Parker are pretextual, Parker does not present any evidence that she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity.

Therefore, the court will analyze Parker's retaliation claim using the direct method of proof. Parker must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered a material adverse action; and (3) a causal link exists between the two. *Porter*, 700 F.3d at 957. Defendants do not dispute that Parker complained to Castro that Simoncini displayed racial hostility toward Gray and that complaints regarding racial discrimination are statutorily protected.[2] And it is undisputed that Parker suffered a materially adverse action by the IHRC when she was fired.[3] The court must determine whether a causal link between Parker's complaint and her termination exists.

To meet the causation or motive requirement, Parker must show that her complaints about Commissioner Simoncini were a "substantial motivating factor" in Castro's and the IHRC's decision to terminate Parker. *Smith*, 681 F.3d at 900, *quoting Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). Parker could do so with direct evidence, which would entail something akin to an admission by Castro that he had a retaliatory motive. *Id.* There is no such direct evidence in this case.

In the absence of an admission, a retaliation Plaintiff may also satisfy the causation or motivation element by presenting a "'convincing mosaic' of circumstantial evidence" supporting the inference that a retaliatory animus was at work. *Rhodes v. Illinois Dep't of Transp.*, 359 F. 3d 498, 504 (7th Cir. 2004), *quoting Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). In general, there are categories of circumstantial evidence available to Plaintiff using the "convincing mosaic" approach:

---

[2] Defendants are correct in arguing that Parker has not set forth sufficient facts to support a claim of retaliation based on complaints of gender discrimination.

[3] As will be addressed more fully, there is a dispute about whether the IHRC or the Office of the Governor made the decision to terminate Parker.

> One includes suspicious timing, ambiguous statements oral or written, …and
> other bits and pieces from which an inference of retaliatory intent might be drawn.
> Another is evidence, but not necessarily rigorous statistical evidence, that
> similarly situated employees were treated differently. Another type is evidence
> that the employer offered a pretextual reason for an adverse employment action.

*Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (brackets, citations, and quotation marks omitted.) Parker has offered no evidence that similarly situated employees were treated more favorably as there was no similarly situated employee. Instead, Parker attempts to construct a convincing mosaic of Castro's retaliatory animus through "bits and pieces" that would suggest to a reasonable juror that Castro tried to get Parker fired because Parker complained about racial discrimination.

Parker relies most heavily on the timeline of events. She argues that she met with Castro regarding Commissioner Simoncini's discriminatory treatment of Gray approximately one month before the Executive Session on February 23, 2011, at which the IHRC gave Parker a vote of "no confidence." Coupled with corroborating evidence of retaliatory motive, evidence of "suspicious timing…can sometimes raise an inference of a causal connection," but it is "rarely sufficient" by itself. *Coleman*, 667 F. 3d at 860, *quoting Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 722 (7th Cir. 2008).

There are two other pieces to Parker's mosaic. First, Defendants' claim that Parker's termination was due to issues that existed before the Rosetta Davis case is undermined by the fact that Parker received near-perfect evaluations prior to her complaints regarding Simoncini's treatment of Gray. Second, Castro has denied responsibility for terminating Parker, attributing that decision to the Office of the Governor. The Office of the Governor, however, has denied that it made the decision.

Viewing Parker's evidence in the light most favorable to her, as the summary judgment standard requires, Parker has adequately made out the required mosaic. "When an adverse employment action follows on the heels of a protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied." *Lang v. Ill. Dep't of Children and Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). While mere temporal proximity, standing alone, would probably be insufficient, the evidence suggests more than just closeness in time.

An employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation. *Lang*, 361 F.3d at 419-21 (considering plaintiff's previous five-year flawless employment record as circumstantial evidence giving rise to an inference of causation when combined with other circumstantial evidence). Prior to her complaint regarding Simoncini, Parker received an overall job performance rating of "Exceptional," the highest possible rating, in her annual performance reviews for the years ending September 2008 and September 2009. It is true that Parker's September 2010 evaluation stated that Parker's overall job performance was "Acceptable" and that Parker struggled with her working relationships with Castro and the Commissioners, needing improvement in that area. But it is also true that the evaluation was not signed until June 27, 2011, more than a month after Parker was terminated. It would not be unreasonable for a jury to conclude that Parker's poorer rating could have been prompted by her protected conduct and by her termination, not the other way around.

Parker's final piece of circumstantial evidence of causation is the attempt by Defendants to disclaim responsibility for the decision to terminate Parker. This record does not make clear who made the decision to terminate Parker and when that decision was made. During his

deposition, Castro stated that the decision to terminate Parker was made by the Office of the Governor and it was communicated to him by Haddox or Schomberg.  However, Schomberg directly contradicts Castro.  Schomberg testified that the ultimate decision to terminate Parker lay with the IHRC;  Castro advised the Office of the Governor as a courtesy, and the Office of the Governor did not object to the IHRC's decision..  The inconsistencies in the testimony of Castro and Schomberg, each denying responsibility for Parker's termination, allows the inference that whoever made the termination decision had no good reason for it.

When viewed in the light most favorable to Parker, the timing of her termination,  her previously impeccable reviews and the questions regarding who made the decision to terminate Parker, creates a triable issue as to whether Parker's complaints of discrimination were a substantial and motivating factor in her termination.

### ii.    Pretext

Once Plaintiff has succeeded in making a *prima facie* case, the burden of production shifts to Defendants to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct.  *Culver v. Gorman*, 416 F.3d 540, 545 (7th Cir. 2005).  The persuasiveness of Defendants' explanation is normally "for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point."  *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997).  Summary judgment should be granted only if Defendants "present[] unrebutted evidence that [they] would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive."  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

The court having found that Parker has established a *prima facie* case of retaliation, the burden shifts to Defendants to show by a preponderance of the evidence that Parker would have been fired even absent her allegations of discrimination. *Culver*, 416 F.3d at 547. Defendants argue that Parker was not meeting Defendants' legitimate employment expectations when a consensus was reached among the Commissioners and Castro that they did not want her to continue to serve as General Counsel.

This court is not a "super personnel review board" that second-guesses an employer's facially legitimate business decisions. *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003). An employee's inability to meet her employer's legitimate employment expectations is of course a legitimate reason for an employer to fire its employee. But the issue before the court is not whether an employer's evaluation of the employee was correct but whether it was honestly believed. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001). Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe Castro and the IHRC's explanation. *Venters*, 123 F.3d at 973. Parker can avoid summary judgment by pointing to specific facts that place Castro and the IHRC's explanation in doubt.

Here, Parker has done so. The evidence indicates that the February 23, 2011 Executive Session was in direct response to complaints made by Parker to Castro regarding Simoncini; were it not for the complaints made by Parker, it is unclear whether Castro would have addressed his concerns about Parker to the Commissioners. Based on the facts presented, the complaints made by Parker appear to have directly precipitated the Executive Session where the Commission determined they had no confidence in Parker's ability as General Counsel.

Parker has created a triable issue of fact. Accordingly, Defendants' motion for summary judgment is denied as to Parker's § 1981 claim for retaliation.

**C.      First Amendment Retaliation Claim**

To prevail on a First Amendment retaliation claim, Plaintiff must show that (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the Defendants' decision to take the retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (*quoting Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir.2006)).  However, in order to establish a claim for retaliation in violation of the First Amendment, a *public* employee first must show that her speech is constitutionally protected. *Swetlik v. Crawford,* 738 F.3d 818, 825 (7th Cir. 2013). For a public employee's speech to be protected under the First Amendment, the employee must establish that (1) the speech was made as a private citizen; (2) it addressed a matter of public concern; and (3) her interest in expressing the speech was not outweighed by the State's interest as an employer in promoting effective and efficient public service.  *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013).  The determination of whether speech is constitutionally protected is a question of law. *Houskins v. Sheahan,* 549 F.3d 480, 489 (7th Cir. 2008).

The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951.  "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description."  *Houskins*, 549 F.3d at 490 (citation omitted); *see also Garcetti*, 547 U.S. at 424–25, 126 S.Ct. 1951 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform…").

Here, the evidence demonstrates that Parker's statements were made, not as a private citizen, but pursuant to her job duties as General Counsel. Parker does not dispute that as General Counsel, she also served as the Chief Ethics Officer for the IHRC. As Chief Ethics Officer, if Parker observed an IHRC employee or Commissioner doing something that she believed was unethical, she was required to report it to the OGC. Parker did that when, in her monthly report to the OGC on November 23, 2010, she stated that one of the Commissioners' "behavior was in dereliction of the Act, and therefore, [] not in furtherance of the interest of justice and [has] potential of bringing shame upon the Entire Commission, and upon the State." Parker submitted two more reports to the OGC with the same language. In addition, Parker advised her superior, Castro, of her thoughts regarding Simoncini's behavior.

Parker's complaints fail the first prong of the test in *Swetlik* because she raised them to her superiors as part of her official duties rather than in her capacity as a private citizen. *Biven v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010) (holding that complaints the plaintiff made directly up the chain of command to his supervisors were not protected by the First Amendment); *Vose v. Kliment*, 506 F.3d 5657, 570 (police officer reporting misconduct of officers in another unit was not acting as a private citizen); *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 511 (7th Cir. 2007) (plaintiff was not speaking as a citizen when he reported his colleagues' misconduct to supervisors); *Michalowski v. Rutherford*, 82 F.Supp.3d 775, 794 (N.D. Ill. 2015) (plaintiff was acting in his official capacity when he made complaints to his superiors); *Foster v. Blagojevich*, No. 04 C 2069, 2006 WL 1375060, at *5 (N.D. Ill. May 18, 2006) (assistant warden acting within his official duties in speaking out against unlawful hiring practices and other issues at department of corrections). Defendants' motion for summary judgment as to the First Amendment claim is granted.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [81] is granted in part and denied in part.  The court grants summary judgment in favor of Defendants as to the Title VII and First Amendment retaliation claims.  The court denies summary judgment as to Parker's § 1981 claim for retaliation.  The parties are to appear for status on March 23, 2016 at 9:30 a.m.

Date:  March 14, 2015                                      _____/s/_____

                                                            Joan B. Gottschall
                                                            United States District Judge